## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNIVERSITY OF KANSAS HOSPITAL AUTHORITY,<br>4000 Cambridge St, Kansas City, KS 66160<br><br>*Plaintiff*,<br><br>vs.<br><br><br>ROBERT F. KENNEDY, JR. in his official capacity as Secretary, United States Department of Health and Human Services,<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201;<br><br>THOMAS ENGELS, in his official capacity as Administrator, Health Resources and Services Administration,<br>5600 Fishers Lane, Rockville, MD 20852;<br><br>and<br><br>Health Resources and Services Administration,<br>5600 Fishers Lane, Rockville, MD 20852<br><br>*Defendants*. | Civil Action No. <u>25-549</u> |

## <u>COMPLAINT</u>

Plaintiff University of Kansas Hospital Authority, by and through its attorneys, Polsinelli PC, brings this Complaint against Robert F. Kennedy, Jr., Secretary of the Department of Health & Human Services, Thomas Engels, Administrator, Health Resources and Services Administration, and the Health Resources and Services Administration (collectively, "HRSA"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      The University of Kansas Hospital Authority, operating the University of Kansas Hospital ("UKHA") is an instrumentality of the state of Kansas and a body politic and corporate. The Authority has been recognized by the IRS as exempt from taxation by virtue of being an integral part of the state of Kansas. The hospital is nationally ranked[1] and consistently identified as the top hospital in both Kansas[2] and the Kansas City metropolitan region. University of Kansas Hospital is a 1,054-bed hospital serving patients across Kansas, Missouri, and from all fifty states and countries around the world. To its knowledge, UKHA provides more charity and uncompensated care than any other hospital in Kansas. UKHA's ability to serve as a safety-net hospital and provide medical services to indigent patients is made possible by its participation in the drug pricing program under Section 340B of the Public Health Service Act (the "340B Program").

2.      The 340B Program was created with the specific purpose of protecting safety-net providers, like UKHA, from the costs associated with ever-increasing pharmaceutical pricing, so that these safety-net providers can continue supporting the healthcare infrastructure by providing medical services to a disproportionate amount of indigent patients at reduced or no cost. *See* Veterans Health Care Act of 1992, Pub. L. 102-585 (Nov. 4, 1992) ("340B Statute"). The 340B Program places a cap on the amount that pharmaceutical manufacturers[3] can charge these safety-net providers (known as "covered entities") for covered outpatient drugs under the statute. *See*

---

[1]  U.S. News & World Report, *University of Kansas Hospital*, available at https://health.usnews.com/best-hospitals/area/ks/university-of-kansas-hospital-6670510 (last visited Feb. 11, 2025).

[2]  *Id.*

[3]  Drug manufacturers must participate in the 340B Program for their products to be reimbursable under the Medicare and Medicaid programs. *See* 42 U.S.C. § 256b(a).

*generally* 42 U.S.C. § 256b(a)(1). The savings associated with the 340B Program provide critical

cost reductions to covered entities so they can provide greater access to more comprehensive

services regardless of ability to pay.

3.     The Health Resources and Services Administration ("HRSA"), an agency of the

Department of Health and Human Services ("HHS"), is responsible for administering the 340B

Program. *See e.g*., 89 Fed. Reg. 28,643 ("The Health Resources and Services Administration

administers section 340B of the Public Health Service (PHS) Act, which is referred to as the '340B

Drug Pricing Program' or the '340B Program.'").

4.     The 340B Statute provides eligibility requirements for covered entities and

permitted pricing practices for manufacturers. It also includes prohibitions on covered entities'

receipt of "duplicate discounts" or engagement in "diversion" of drugs purchased under the 340B

Program. 42 U.S.C. § 256b(a)(5)(A)-(B). Duplicate discounts occur where a covered entity

receives a discount through the 340B Program, and a state Medicaid agency receives a

manufacturer rebate on the same drug.  42 U.S.C. § 256b(a)(5)(A)(i). Diversion occurs where a

covered entity sells or transfers a drug obtained through the 340B Program to a person who is not

a patient of the entity. 42 U.S.C. § 256b(a)(5)(B).

5.     To determine whether duplicate discounts or diversion occurred, the 340B Statute

provides pharmaceutical manufacturers a ***limited*** right to audit covered entities. 42 U.S.C.

§ 256b(a)(5)(C). This audit must solely relate to assessment of duplicate discounts and/or diversion

and must be conducted in accordance with the procedures set forth by the Secretary. *See id*.

Further, Congress left no room for interpretation as it pertains to the scope of manufacturers audits

when it clearly included language limiting the audits to records that "*directly* pertain to the entity's

compliance with the requirements described in subparagraphs (A) [duplicate discounts] or (B)

[diversion] with respect to drugs of the manufacturer." *See id.* HRSA cannot authorize manufacturer audits that exceed the scope authorized under the 340B Statute.

6.    HRSA has published Manufacturer Audit Guidelines pursuant to the 340B Statute's requirement that audits be conducted in accordance with procedures established by the Secretary. *See* Final Notice, 61 Fed. Reg. 65,406-65,413 (Dec. 12, 1996); Notice Regarding Section 602 of the Veterans Health Care Act of 1992, 59 Fed. Reg. 30,021 (Jun. 10, 1994) (issuing proposed Manufacturer Audit Guidelines and opening a thirty-day public comment period). Thus, the Manufacturer Audit Guidelines establish procedures that a manufacturer must follow before they are permitted to audit a covered entity for a perceived violation of the statute, and, correspondingly, which HRSA must follow in its consideration and approval of such audits. *See* 61 Fed. Reg. at 65,410.

7.    Under HRSA's guidelines, before a manufacturer is permitted to audit a covered entity they must first: (1) provide written notice to the covered entity that the manufacturer believes the covered entity has violated the 340B Statute; (2) engage in thirty days of good faith attempts to resolve the issue with the covered entity; and (3) limit the scope of the audit to that which "directly pertain[s] to the entity's compliance [with duplicate discount and diversion provisions]" and to those issues that cannot be resolved through good faith discussions with the covered entity. 42 U.S.C. § 256b(a)(5)(C); *see also* 61 Fed. Reg. 65,406. HRSA's guidelines reinforce the statutory limitations Congress imposed on manufacturer audits.

8.    As HRSA has acknowledged, these requirements are designed to protect covered entities from overbroad or unreasonable audits, and to provide covered entities with an opportunity to understand the basis of an audit. *See* 61 Fed. Reg at 65,406.

9.    HRSA violated its own guidelines when it approved pharmaceutical manufacturer Johnson & Johnson's ("J&J") request to audit UKHA despite J&J's failure to satisfy any of the statutory prerequisites for conducting an audit. J&J *never* provided UKHA with written notice that it believed UKHA had violated the 340B Statute, nor did it engage in good faith discussions with UKHA about any suspected violation. Instead, J&J made vague inquiries to UKHA to discuss its "340B utilization" and, upon information and belief, did not wait for UKHA's responses to these inquiries before submitting its audit request to HRSA. J&J provided no notice and made no attempt to work with UKHA to resolve the matter.

10.    Worse yet, the audit proposed by J&J goes far outside the bounds of what is allowed by the 340B Statute and HRSA's Manufacturer Audit Guidelines. J&J demands voluminous documents and information that are irrelevant for and do not directly pertain to identifying duplicate discounts or diversion, including even Health Insurance Portability and Accountability Act ("HIPAA")-protected health information of patients and personally identifiable information of UKHA employees and healthcare professionals.

11.    J&J has expressly stated that the 340B Program poses a risk to its profits and has sought to limit covered entities' rightful participation in the program, including through abuse of the audit process. Several lawsuits have been filed against HRSA in relation to J&J's repeated and overt violations of the Manufacturer Audit Guidelines prior to submitting audit requests to HRSA, and J&J has consistently injected itself into litigation involving the 340B Program to baselessly accuse covered entities of abusing the program. Most recently, J&J sought to institute an unlawful "rebate" program, whereby it would unlawfully restrict access to 340B pricing for certain drugs, but would instead require covered entities to submit data to apply for discretionary "rebates" on 340B eligible drug purchases that J&J may or may not pay at a later date. Collectively, J&J's

actions are all overt attempts to violate the 340B Statute and Congressional intent. The instant audit is yet another attempt to wreak havoc on the 340B Program at the expense of safety net providers and the patients they serve.

12. Even though J&J initiated its audit against UKHA in an unlawful manner, UKHA made numerous attempts, over the course of several months, to work with J&J to narrow the scope of the audit so that it would be consistent with that which is permitted under the 340B Statute. Despite having no obligation to do so, UKHA expended considerable time and resources in these attempts as a courtesy and in an effort to conserve judicial resources. However, J&J refused to take steps that would ensure its audit would be conducted in a manner consistent with the 340B Statute.

13. HRSA has abdicated its responsibility to administer the 340B Program and ensure compliance with Congress's mandate in the 340B Statute and relevant policies (including HRSA's own Manufacturer Audit Guidelines) by failing to protect UKHA and other covered entities against J&J's overbroad and baseless audits.

14. UKHA has engaged with HRSA on multiple occasions seeking to inform the agency of the unlawfulness of both J&J's and HRSA's actions. Yet HRSA has repeatedly refused to reconsider its decision to approve J&J's audit and has even threatened to terminate UKHA from the 340B Program if it does not comply with J&J's unlawful and overly broad audit. Thus, HRSA has confirmed the finality of its decision that J&J may conduct its requested audit and that UKHA must comply with it or face termination from the 340B Program. HRSA's final agency action is arbitrary and capricious and outside the scope of its authority under the 340B Statute, and UKHA has no recourse but to file the instant action or face termination of its critical 340B Program participation.

15.    UKHA brings this action for declaratory relief and injunctive relief to halt HRSA's illegal actions. Specifically, HRSA acted unlawfully on June 19, 2024, when it authorized J&J to audit UKHA's confidential business records without following HRSA's own requirements for the initiation of such audits, and by allowing J&J to audit records far outside the bounds of what is contemplated by the 340B Statute.

## JURISDICTION & VENUE

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1361. This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 700, *et seq.*, the 340B Statute, 42 U.S.C. § 256b, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

17.    HRSA's unlawful and improper decision to allow a pharmaceutical manufacturer to audit UKHA's confidential business records, and to require that UKHA comply with the audit or otherwise face termination from the 340B Program, is a final agency action that constitutes an actual and justiciable controversy for which UKHA is entitled to review and relief under 5 U.S.C. §§ 702, 704–706. UKHA has standing to maintain this action pursuant to the APA as a legal entity that has suffered a legal wrong and has been adversely affected by final agency action.

18.    There exists an actual, substantial, and continuing controversy between the parties regarding HRSA's application of the Manufacturer Audit Guidelines and whether HRSA has appropriately followed the 340B Statute. This Court may declare the rights and legal relations of the parties under 28 U.S.C. §§ 2201, 2202.

19.    The Court has personal jurisdiction over each of the Defendants because they are either located in, and/or conduct substantial business in, and/or have regular and systematic contact with this District.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

## PARTIES

21.    As stated above, UKHA is an instrumentality of the state of Kansas and a body politic and corporate.

22.    UKHA is a covered entity under the 340B Program, meeting the 340B Statute's definition of a Disproportionate Share Hospital ("DSH"), because it is a government-operated, nonprofit hospital that serves a disproportionate share of indigent patients. *See* 42 U.S.C. § 256b (a)(4)(L).

23.    UKHA is the #1-ranked hospital in Kansas, is nationally ranked in six adult specialties, and is rated high performing in four adult specialties and seventeen procedures and conditions.[4] This means that UKHA "excel[s] in caring for the sickest, most medically complex patients."[5] UKHA is one of few hospitals in Kansas that provides high-level specialty care to a population of more than 2.9 million. UKHA also frequently treats residents of its neighboring state Missouri, due to its location in the Kansas City metro area.

24.    UKHA is a nonprofit that is dedicated to enhancing the health and wellness of the individuals, families, and communities it serves. In furtherance of this mission, to its knowledge, UKHA provides more charity and uncompensated care for uninsured, underserved, and low-income patients than any other hospital in the State of Kansas. This provision of care is essential to the region's healthcare system and infrastructure, and lowers the costs associated with healthcare, as it prevents individuals from needlessly suffering and entering the care system after otherwise preventable and treatable problems have become severe and/or life-threatening.

---

[4] U.S. News & World Report, *University of Kansas Hospital*, available at https://health.usnews.com/best-hospitals/area/ks/university-of-kansas-hospital-6670510 (last visited Feb. 11, 2025).

[5] *Id.*

25.     On an annual basis, UKHA provides hundreds of millions of dollars in uncompensated, undercompensated, and charity care to the communities that is serves.

26.     The 340B Program is critical to UKHA's ability to enhance the health and wellness of the public because it allows UKHA to reinvest the savings associated with the program back into safety-net care services. During a time of unprecedented challenges in the healthcare sector, the 340B Program is more critical than ever to extending UKHA's resources and patient care programs.

27.     Defendant Robert F. Kennedy, Jr. is the Secretary of Health and Human Services. Kennedy maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is sued in his official capacity only.

28.     Defendant Thomas Engels is the Administrator of the Health Resources and Services Administration, an operating division within the Department of Health and Human Services. Engels maintains an office at 5600 Fishers Lane, Rockville, Maryland 20852. The administrator is sued in his official capacity only.

29.     Defendant Health Resources and Services Administration ("HRSA") is an agency within the U.S. Department of Health and Human Services. HRSA's main office is located at 5600 Fishers Lane, Rockville, Maryland 20852.

## LEGAL BACKGROUND

### The 340B Program

30.     The 340B Program was created by Congress in 1992 in response to the significant increases in drug prices that safety-net hospitals and clinics were facing as pharmaceutical manufacturers continuously inflated drug prices and shifted costs to safety-net providers following the creation of the Medicaid Drug Rebate Program ("MDRP") in 1990. *See* Veterans Health Care

Act of 1992, Pub. L. 102-585, § 256b, 106 Stat. 4943 (1992); H.R. Rep. No. 384, 102d Cong., 2d

Sess. Pt. 2 at 10-12 (1992) (hereinafter "Veterans Health Care Act of 1992").

31.     The 340B Program reduces costs for covered entities by allowing them to purchase

certain drugs at the same rate that applies to state Medicaid programs. *See generally* 42 U.S.C.

§ 256b(a)(1) (referencing the "average manufacturer price" under Title XIX of the Social Security

Act); *see also* 42 U.S.C. § 1396r-8 (establishing the Medicaid Drug Rebate Program under which

manufacturers pay rebates to state Medicaid agencies).

32.     To achieve this goal, the 340B Statute orders that the Secretary of the Department

of Health and Human Services ("HHS") enter into agreements with manufacturers of covered

outpatient drugs that prohibit safety-net entities, who qualify as a "covered entity" under the

statute, from having to purchase these drugs in excess of the rate established by the 340B Statute.

See 42 U.S.C. § 256b(a)(1).

33.     The 340B Statute outlines requirements for manufacturers and safety-net entities

that may participate in the 340B Program, 42 U.S.C. § 256b(a)(4); prohibits covered entities from

engaging in "duplicate discounts" and "diversion" under the program, § 256b(a)(5)(A)-(B); and

establishes penalties for violations of the statute. § 256b(a)(5)(D), 256b(d)(2)(B)(v).

34.     The 340B Statute also gives the Secretary and participating manufacturers a limited

right to audit covered entities. The statute provides:

> A covered entity shall permit the Secretary and the manufacturer of
> a covered outpatient drug . . . (acting in accordance with procedures
> established by the Secretary relating to the number, duration, and
> scope of audits) to audit at the Secretary's or manufacturers expense
> the records of the covered entity that *directly* pertain to the entity's
> compliance [with the duplicate discount and diversion prohibitions]
> with respect to drugs of the manufacturer.

42 U.S.C. § 256b(a)(5)(C).

35.     The 340B Statute clearly limits the scope of covered entity records that manufacturers may audit to only those that directly pertain to diversion or duplicate discounts.  *Id.*

**The Manufacturer Audit Guidelines**

36.     In 1996, HRSA published the Manufacturer Audit Guidelines. *See* 61 Fed. Reg. 65,406 (Dec. 12, 1996); 59 Fed. Reg. 30,021(Jun. 10, 1994) (issuing proposed guidelines and opening a thirty-day public comment period).

37.     When HRSA published the Manufacturer Audit Guidelines, it specifically invoked the Congressional directives of Section 256b(a)(5)(C). 61 Fed. Reg. at 65,406.

38.     The Manufacturer Audit Guidelines establish procedures that a manufacturer must follow before they are permitted to audit a covered entity for a perceived violation of the statute, and, correspondingly, which HRSA must follow in its consideration and approval of such audits. 61 Fed. Reg. at 65,410.

39.     For instance, before a manufacturer can audit a covered entity, they must "notify the entity in writing when it believes the entity has violated provisions of section 340B." 61 Fed. Reg. at 65,410.

40.     This notice then triggers a thirty-day period in which the parties are mandated to "attempt in good faith to resolve the matter." *Id*.

41.     Only after this good-faith attempt fails is the manufacturer permitted to submit a request to HRSA asking for permission to audit the covered entity. *Id*.

42.     Additionally, the Manufacturer Audit Guidelines provide that a manufacturer may only conduct an audit "when it has documentation which indicates that there is reasonable cause." *Id*.

11

43.    The Manufacturer Audit Guidelines limit the scope of any proposed audit to one year, and as such manufacturers may only seek data and information from a one-year time period. *Id.*

44.    Before the manufacturer is permitted to move forward with an audit, they must provide HRSA with (a) a work plan for the audit; (b) "a clear description" with "sufficient facts and evidence" of why the manufacturer "has reasonable cause to believe that a violation of section 340B(a)(5)(A) or (B) has occurred"; and (c) "copies of any documents supporting its claims." *Id.*

45.    HRSA must then review the materials submitted by the manufacturer to determine if there is "reasonable cause" for an audit. *Id.*

46.    HRSA has commented that its "review of the audit workplan is necessary to ensure that audit work performed is relevant to the audit objectives while protecting patient confidentiality and information of the covered entity which is considered proprietary." *Id.* at 65,406. Further, HRSA's review is to "ensure that the audits are performed where there are valid business concerns and are conducted with the least possible disruption to the covered entity." *Id.*

47.    The Manufacturer Audit Guidelines define "reasonable cause" as whether "a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B)[.]" *Id.* at 65,409.

48.    Only after HRSA finds that the manufacturer has shown reasonable cause may the manufacturer move forward with the audit. *See id.* at 65,410.

49.    The only way a covered entity knows that HRSA has determined "reasonable cause" exists for an audit is if a manufacturer notifies the covered entity. The covered entity has no way of knowing what the manufacturer has submitted to HRSA, what HRSA considered in

making its findings, or HRSA's position on the scope of the audit proposed by the manufacturer unless such information is provided by the manufacturer and/or HRSA.

50.     This is so even though HRSA's Manufacturer Audit Guidelines contemplate an administrative dispute resolution ("ADR") process. That process is only accessible after a proposed audit is completed, and it is limited to claims by manufacturers that their audit has shown duplicate discounts or diversion. 42 C.F.R. § 10.21 (limiting administrative dispute resolution claims to claims by covered entities for overcharges and claims by manufacturers re: audit findings of duplicate discounts or diversion). In other words, the sole method by which covered entities may be protected against baseless, costly, overbroad, and intrusive audits are the requirements for notice, good faith discussion, and appropriate and fulsome HRSA review, none of which have occurred here.

51.     HRSA's failure to follow its own guidelines in the instant case have resulted in the agency deciding that UKHA's lack of compliance with the audit that HRSA unlawfully approved is grounds for termination from the 340B Program.

## FACTUAL BACKGROUND

**J&J Fails to Satisfy Prerequisites for an Audit Before Submitting its Request to HRSA**

52.     On April 22, 2024, J&J emailed UKHA to request a phone call to "discuss and ask questions regarding [UKHA's] 340B utilization." J&J did not notify UKHA it believed the covered entity to have violated the 340B Statute, nor did J&J provide any specific information about its inquiries. J&J made no reference to suspected diversion or duplicate discounts and did not provide any data that would suggest J&J was reaching out about such issues. Email Correspondence Between UKHA and J&J dated April 22, 2024 through April 25, 2024 (Exhibit 1).

53.    UKHA promptly responded to J&J's email inquiry that same day and requested that J&J provide more specific information so that it could ensure that the correct team members would be present during the phone call. Ex. 1.

54.    J&J responded but continued to only provide vague and high-level information about its inquiry. Again, J&J did not notify UKHA that it believed UKHA had violated the 340B Statute, nor did J&J provide any information that would indicate such belief. Ex. 1.

55.    On April 25, 2024—despite J&J's failure to provide any more specificity about the information it sought or the reasons therefor, and without any obligation to engage with J&J about its vague inquiries—UKHA provided J&J with its availability for a phone call in an attempt to be courteous and cooperative. Ex. 1.

56.    On or about May 3, 2024, UKHA participated in a phone call with J&J. During this discussion, J&J asked very generic questions about the "growth" in UKHA's purchases of J&J's products. J&J did not identify any specific drug(s) that they had allegedly seen such growth, instead requesting information about UKHA's general 340B practices and policies. UKHA informed J&J that there had been an increase in the need for oncology and infusion services. UKHA operates the University of Kansas Cancer Center throughout the greater Kansas City metropolitan area, which serves an ever-growing number of patients from across the country of increasing complexity and severity, which may have resulted in the increased utilization of certain J&J products.

57.    During this phone call, J&J never stated or indicated that it believed UKHA to have violated the 340B Statute.

58.    On May 24, 2024, J&J emailed UKHA with three additional follow-up questions regarding UKHA's 340B program. Nowhere in this email did J&J state that it believed UKHA had

violated the 340B Statute. Email Correspondence Between UKHA and J&J dated May 24, 2024 through May 31, 2024 (Exhibit 2).

59.     On May 31, 2024, UKHA responded to J&J's additional questions, despite having no such obligation to do so. Ex. 2. J&J never responded to UKHA's email.

60.     UKHA heard nothing from J&J for several weeks. Then, on June 20, 2024, UKHA received a letter from J&J's contractor, Deloitte, indicating that HRSA had approved J&J's request to audit UKHA the day prior, on June 19, 2024. Letter from M. Imada to T. Holt dated Jun. 20, 2024 (Exhibit 3).

61.     Upon information and belief, J&J submitted its audit work plan to HRSA on or about June 14, 2024, without acknowledging or engaging in any good faith discussion with UKHA about the detailed responses it provided to J&J's vague inquiries on May 31, 2024.

62.     UKHA was surprised to receive this letter from Deloitte considering it had recently responded to additional questions from J&J, and because J&J never notified UKHA in writing or otherwise, that it believed UKHA had violated the 340B Statute and did not engage in good faith discussions with UKHA regarding the same.

**J&J's Audit Exceeds the Bounds of the 340B Statute and Manufacturer Audit Guidelines**

63.     Deloitte provided UKHA with a "Data Request List" along with the letter notifying UKHA that it had been retained by J&J to audit UKHA. This list demanded access to voluminous, confidential records held by UKHA that contain information about its patients, employees, business operations, and clinical operations, as part of J&J's audit. Initial Documentation and Data Request List (Exhibit 4).

64.     The extensive documents requested by Deloitte include patients' HIPAA-protected health information, personally identifiable information of many of UKHA's employees and providers outside of UKHA, and confidential contracts and other business records that would

require extensive legal review and redaction before production. (Exhibit 4). Many, if not the majority, of the requests exceed the scope of manufacturer audits contemplated by Congress when establishing the 340B Statute as the requests have no bearing on the prohibition on diversion or duplicate discounts. 42 U.S.C. § 256b(a)(5)(C).

65.    HRSA has been conducting its own audits of covered entities for decades, and those audits simply ask for 340B utilization data to assess compliance with diversion and duplicate discount standards. Deloitte's process and resulting requests exceed the bounds of the 340B Statute, and are grossly in excess of what HRSA, the agency that oversees the 340B Program, requests.

66.    For instance, Deloitte asked for transactional data for *all* drug orders, not just 340B purchases. There would be no need to review non-340B purchases to identify duplicate discounts or diversion within a 340B operation. Ex. 4.

67.    Deloitte asked for copies of internal policies and procedures and an invasive view into UKHA's entire pharmacy operation, which would, again, encompass much more than necessary to identify duplicate discounts or diversion within UKHA's 340B operations. *Id.* 340B diversion and duplicate discounts are assessed by reviewing 340B utilization data and corresponding patient history, and nothing more. *Id*.

68.    In addition, Deloitte requested data and information for more than a one-year audit period, which goes beyond the scope allowed by HRSA's Manufacturer Audit Guidelines. *See* 61 Fed. Reg. at 65,410.

69.    Deloitte unilaterally demanded that UKHA provide the extensive data and information requested by July 10, 2024—giving UKHA less than three weeks to compile a

significant amount of information and documents, many which would require internal review and redaction prior to production. Ex. 4.

70.    Despite J&J's failure to adhere to the Manufacturer Audit Guidelines prior to initiating its audit of UKHA, and HRSA's unlawful approval of the audit, UKHA agreed to discuss the audit proceedings with Deloitte and J&J in the hopes that it could convince them to modify the audit requests and the production timeline, so that the requests would be within the scope of that which is permitted under HRSA's guidelines and the 340B Statute and to minimize interruptions to UKHA's operations. Email Correspondence Between UKHA and Deloitte and J&J dated Jul. 2, 2024 through Jul. 17, 2024 (Exhibit 6). *See also* Ex. 5 (containing a copy of Deloitte's DRL that was annotated by UKHA in the hopes of modifying the audit requests). These negotiations continued over the next several months. *See e.g*., Email Correspondence Between Counsel for UKHA and Counsel for J&J dated Jan. 28, 2025 through Feb. 7, 2025 (Exhibit 7).

71.    As part of these discussions, UKHA requested copies of the audit work plan that had been approved by HRSA and other materials that had been submitted by J&J in support of its audit request. J&J responded that it would only agree to share these materials if UKHA agreed to keep all information contained within completely confidential. Ex. 6. While UKHA agreed that it would keep any of J&J's proprietary information confidential, it could not commit to such a broad and strict confidentiality agreement without knowing what type of information might be contained within these materials—especially because UKHA had learned that several other covered entities had recently filed suit against HRSA for the unlawful approval of audits requested by J&J without the manufacturer having followed the written notice and good faith requirements, identical to the case here. *See Children's Nat'l. Med. Ctr. v. Johnson et al*., D.D.C. Case No. 1:24-cv-02563, *Children's National Medical Center's Complaint* (Dkt. No. 1); *Oregon Health & Science Univ. v.*

*Johnson et al.*, D.D.C. Case No. 1:24-cv-02184, *Oregon Health & Science University's Complaint* (Dkt. No. 1); *Maine General Medical Center v. Johnson et al.*, D.S.C. Case No. 1:24-cv-02187, *Maine General Medical Center's Complaint*, (Dkt. No. 1); *Univ. of Rochester v. Johnson et al.*, D.D.C. Case No. 1:24-cv-02268, *University of Rochester's Complaint*, (Dkt. No. 1); *Univ. Wash. Med. Ctr. v. Becerra, et al.*, D.D.C. Case No. 1:24-cv-02998-RC, *UWMC's Complaint*, (Dkt. No. 1).

72.     Thus, after attempting to work with J&J towards a mutually agreeable way to proceed with the audit, UKHA still had reasonable concerns that J&J would abuse the audit process to gain confidential information about UKHA's business practices that it could later use against UKHA and other covered entities in the manufacturer's crusade against the 340B Program. These concerns were heightened by the fact that J&J has initiated audits against several other academic health systems without adhering to the Manufacturer Audit Guidelines and by the fact that J&J will not disclose its own audit work plan and other materials that it sent to HRSA unless UKHA agrees to unreasonable confidentiality terms.

73.     Notwithstanding UKHA learning that five other academic health systems filed lawsuits challenging J&J audits that HRSA approved under what appears to be similar circumstances, UKHA spent considerable time and resources as it attempted to work with J&J (although having no obligation to do so) for nearly eight months to narrow the data requests to ensure the audit would be conducted consistent with the 340B Statute. *See e.g.*, Exs. 5, 6, and 7. UKHA did this as a courtesy to avoid having to rely on judicial resources, but J&J and HRSA have taken no steps to ensure that the instant audit will be conducted consistent with the 340B Statute. *See* Ex. 7 (demonstrating that J&J was unwilling to modify its audit requests to comply with the Manufacturer Audit Guidelines).

74.     UKHA has made J&J aware, through its counsel and Deloitte, that many of Deloitte's requests exceed what is authorized by the 340B Statute, and yet J&J continues to double down on the requests while disregarding the plain language of the 340B Statute. *See e.g.*, Email Correspondence Between Counsel for UKHA and Counsel for J&J dated Jan. 11, 2025 (Exhibit 5) (circulating an annotated version of Deloitte's DRL wherein UKHA points out that many of the requests exceed the scope of the 340B Statute).

75.     On February 19, 2025, J&J's counsel sent a letter to HRSA baselessly accusing UKHA of not cooperating with J&J's audit requests. Letter from Counsel for J&J to HRSA dated Feb. 19, 2025 (Exhibit 8).

76.     Unsurprisingly, J&J's letter fails to address UKHA's significant efforts to work with J&J and Deloitte to move forward with the audit or UKHA's strong concerns about the methods and processes that J&J and Deloitte were employing to conduct the unlawful and overly broad audit.

77.     UKHA responded to this letter on February 20, 2025, detailing the mischaracterizations in J&J's letter and UKHA's attempts to work with J&J, which were ultimately fruitless due to J&J's unwillingness to limit the audit to be consistent with the 340B Statute and HRSA's Guidelines. (Exhibit 9).

78.     J&J, refusing to let UKHA have the last word, sent another letter to HRSA on February 21, 2025, in which J&J further emphasized that it has no intention of changing the scope of the audit to be consistent with the 340B Statute and/or Manufacturer Audit Guidelines. Letter from Counsel for J&J to HRSA dated Feb. 21, 2025 (Exhibit 16).

79.     UKHA has a consistent pattern and practice of cooperating with all manufacturer-requested inquiries related to 340B program compliance, and both started and successfully

completed a reasonable, good faith inquiry from a major manufacturer during the extended discussions and negotiations that have been ongoing with J&J.

**HRSA Emphasizes the Finality of its Audit Approval Decision by Denying Multiple Requests for Reconsideration, and by Stating that Failure to Comply with J&J's Audit was Grounds for Terminating UKHA From the 340B Program.**

80.    On June 28, 2024, UKHA's counsel wrote to HRSA seeking reconsideration of HRSA's approval of J&J's 340B audit of UKHA. Letter from K. Vasquez to C. Britton (Jun. 28, 2024) (Exhibit 10).

81.    In this correspondence, UKHA provided a timeline of its discussions with J&J to demonstrate to HRSA that J&J had failed to give written notice of any violation of the 340B Statute and had failed to engage in good faith resolution efforts for at least thirty days prior to submitting its audit work plan for HRSA's approval. *Id.*

82.    Counsel also informed HRSA that J&J's audit requests far exceeded the scope of that which is contemplated by the 340B Statute and the Manufacturer Audit Guidelines. *Id.*

83.    In the hopes of obtaining some modicum of information regarding the basis for the audit and HRSA's review, UKHA also asked for copies of HRSA's communications with J&J and its contractors, including, but not limited to, audit workplans and other information HRSA relied upon in approving J&J's audit request. *Id.*

84.    On July 2, 2024, HRSA denied UKHA's request to reconsider the audit approval and UKHA's requests for documentation. Letter from C. Britton to K. Vasquez (Jul. 2, 2024) (Exhibit 11).

85.    HRSA only responded that it had reviewed the "good faith timelines" and determined that J&J met the threshold requirements. HRSA did not provide any additional explanation or specificity. *Id.*

86.     HRSA suggested that UKHA submit its request for documents directly to J&J or resubmit to HRSA through a Freedom of Information Act ("FOIA") request. *Id.* As detailed above, UKHA made repeated requests to J&J for these materials, but J&J refused to provide any such documents unless UKHA agreed to a strict confidentiality agreement, which would effectively preclude UKHA from bringing to light any information within these documents that could potentially further illustrate the illegality of J&J's and HRSA's conduct.

87.     On November 12, 2024, HRSA sent a letter to UKHA inquiring about the status of J&J's audit. Letter from C. Britton to R. Couldry (Nov. 12, 2024) (Exhibit 12). Specifically, HRSA stated that it understood J&J's audit had not yet commenced and that UKHA had not submitted any records to J&J's auditor to date. HRSA then stated that it had determined that J&J had satisfied HRSA's Manufacturer Audit Guidelines to conduct its audit of UKHA, and, "[t]o the extent that UKHA inhibits the audit from proceeding, HRSA reserves the right to remove UKHA from the 340B Program, as failure to permit a manufacturer or HRSA audit from proceeding would violate the eligibility requirement in section 340B(a)(5)(C) of the Public Health Service Act." *Id.*

88.     HRSA has thus made a final decision that UKHA must submit to an overbroad, burdensome, and intrusive audit by third party J&J, who is not HRSA and who clearly demonstrated that it has a conflict of interest, without J&J having satisfied the prerequisites of the 340B Statute or HRSA's own Manufacturer Audit Guidelines.

89.     Despite HRSA's unlawful approval of J&J's audit, UKHA still attempted, over the course of eight months, to work with J&J so that the scope of the audit would be consistent with the 340B Statute. *See e.g.*, Exs. 5-7. These attempts were ultimately unsuccessful as neither J&J nor HRSA agreed to take any steps that would have ensured that UKHA received the benefit of the protections embedded in the 340B Statute.

90.    Instead, HRSA further emphasized the finality of its decision by stating that UKHA's failure to comply with J&J's unlawful audit violates the eligibility requirement of the 340B Statute and constitutes grounds for termination from the program. Ex. 12.

91.    HRSA's decision has thus left UKHA with only two options: comply with the improperly authorized, intrusive audit conducted by a conflicted party that goes beyond the scope contemplated by the 340B Statute and Manufacturer Audit Guidelines, or file the instant lawsuit.

**J&J's Unlawful Actions Are Part of a Larger Scheme Well Known to HRSA**

92.    In recent years, J&J has engaged in public attempts to limit covered entities' participation in the 340B Program in furtherance of the manufacturer's business interests.

93.    For example, J&J has described the 340B Program as a risk to the company's profits, and has described that limiting access to 340B drugs has a positive impact on J&J's sales to consumers. Johnson & Johnson, Form 10-K for 2023, p. 10, 38 (Exhibit 13).

94.    Additionally, within the last two years, J&J has filed amicus curiae briefs in several proceedings involving the 340B Program to baselessly accuse covered entities of "abusing" the program and blame HRSA for "lax enforcement." *See e.g.*, *Genesis Healthcare Inc. v. Becerra*, D.D.C. Case No. 4:19-cv-01531-RBH, *Brief of the Janssen Pharmaceutical Companies as Amici Curiae in Support of Defendants' Motion for Summary Judgment*, at 8 (Dkt. No. 121); *Oregon Health & Science Univ.*, D.D.C. Case No. 1:24-cv-02184-RC, *J&J's Motion for Leave to File Brief as Amicus Curiae in Support of Defendants' Motion to Dismiss*, Ex. A (Dkt. No. 20-1); *MaineGeneral Med. Ctr.*, D.D.C. Case No. 1:24-cv-02187-RC, *J&J's Motion for Leave to File Brief as Amicus Curiae in Support of Defendants' Motion to Dismiss*, Ex. A (Dkt. No. 21-1); *Univ. of Rochester*, D.D.C. Case No. 1:24-cv-02268-RC, *J&J's Motion for Leave to File Brief as Amicus Curiae in Support of Defendants' Motion to Dismiss*, Ex. A (Dkt. No. 20-1); *Children's Nat'l. Med. Ctr.*, D.D.C. Case No. 1:24-cv-02563-RC, *J&J's Motion for Leave to File Brief as Amicus*

*Curiae in Support of Defendants' Motion to Dismiss*, Ex. A (Dkt. No. 18-1); *Univ. Wash. Med. Ctr.*, D.D.C. Case No. 1:24-cv-02998-RC, *J&J's Motion for Leave to File Brief as Amicus Curiae in Support of Defendants' Motion to Dismiss*, Ex. A (Dkt. No. 28-1).

95.    Moreover, as discussed above, J&J has initiated several audits against covered entities without following the written notice and good faith requirements, which are required by law. *See Children's Nat'l.*, D.D.C. Case No. 1:24-cv-02563, *Children's National Medical Center's Complaint* (Dkt. No. 1); *Oregon Health & Science Univ.*, D.D.C. Case No. 1:24-cv-02184, *Oregon Health & Science University's Complaint* (Dkt. No. 1); *MaineGeneral Med. Ctr.*, D.D.C. Case No. 1:24-cv-02187, *MaineGeneral Medical Center's Complaint*, (Dkt. No. 1); *Univ. of Rochester*, D.D.C. Case No. 1:24-cv-02268, *University of Rochester's Complaint*, (Dkt. No. 1); *Univ. Wash. Med. Ctr.*, D.D.C. Case No. 1:24-cv-02998-RC, *UWMC's Complaint*, (Dkt. No. 1). HRSA promulgated the Manufacturer Audit Guidelines in 1996, and on information and belief, other manufacturers have conducted HRSA-approved audits under the Manufacturer Guidelines without controversy. The J&J audits, and the litigation that has followed, cannot be ignored in this context.

96.    Thus, J&J has routinely targeted covered entities with aggressive audits and has consistently disregarded both the 340B Statute and Manufacturer Audit Guidelines, likely in an attempt to prevent covered entities from fully and rightfully participating in the 340B Program.

97.    J&J has also sought to limit covered entities' access to the 340B Program by implementing an unlawful rebate program for 340B purchases. On August 23, 2024, shortly after HRSA's unlawful approval of J&J's audit, J&J issued a notice that it intended to restrict access to 340B discounts on certain covered outpatient drugs by eliminating the point-of-sale 340B discount required by the 340B Statute. Instead, J&J stated it would offer a retroactive rebate that is contingent on certain covered entities providing detailed medical, pharmacy and claims data

regarding each dispense via a third-party system. J&J's Notice to 340B End Customers Regarding Purchases of Stelara and Xarelto (Aug. 23, 2024) (Exhibit 14). On information and belief, J&J's rebate model will increase the price of some covered outpatient drugs by more than 200%.

98.    J&J's notice of intent to initiate this unlawful rebate program prompted HRSA to issue a warning to J&J that such a program "violates J&J's obligations under the 340B statute, and HRSA expects J&J to cease implementation of it." Letter from C. Johnson to J. Duato (Sept. 17, 2024) (Exhibit 15).

99.    Based on J&J's actions, including the foregoing, UKHA reasonably believes that J&J is misusing the audit process for financial gain and to dissuade covered entities from fully and rightfully participating in the 340B Program by subjecting them to unnecessary, aggressive, time-consuming, and costly audits, and otherwise harming covered entities' reputation.

**HRSA's Approval of J&J's Proposed Manufacturer Audit is Unlawful**

100.    HRSA's decision to approve J&J's proposed audit of UKHA is contrary to the 340B Statute and HRSA's own Manufacturer Audit Guidelines and is therefore unlawful.

101.    As detailed in full above, the 340B Statute only permits a manufacturer to audit a covered entity "in accordance with procedures established by the Secretary relating to the scope, duration, and number of audits[.]" 42 U.S.C. § 256b(a)(5)(C). Those procedures—the Manufacturer Audit Guidelines—require a manufacturer to notify a covered entity in writing of an alleged violation of the 340B Statute, and to engage in at least thirty days of good faith attempts to resolve the issue. 61 Fed. Reg. at 65,410. HRSA approved J&J's audit even though neither of these requirements was met here.

102.    In addition, manufacturer audits must be limited in scope to that which "directly pertain[s] to the entity's compliance [with duplicate discount and diversion provisions]," to those issues that cannot be resolved through good faith discussions with the covered entity, and to an

audit scope of only one year. 42 U.S.C. § 256b(a)(5)(C); *see also* 61 Fed. Reg. at 65,406, 65,410. Here, although HRSA and J&J have refused to provide a copy of the audit workplan HRSA approved, J&J's requests for data and information go far beyond what would be necessary to identify duplicate discounts or diversion, go far beyond what UKHA even attempted to discuss with J&J prior to J&J's audit request, and seek data for a time period longer than one year. For example, J&J's requests seek HIPAA-protected patient information that would be irrelevant for purposes of discovering duplicate discounts or diversions. Thus, HRSA's approval of such an overbroad audit scope does not comply with the 340B Statute or HRSA's own Manufacturer Audit Guidelines.

103.    As HRSA has acknowledged, these mandatory procedures protect covered entities and limit the scope of a manufacturer's audit to the issues that cannot be resolved through good-faith discussions between the manufacturer and the covered entity. Otherwise, covered entities are without any method for understanding the concerns of the manufacturer auditing them, or protecting themselves against unreasonable demands that go outside the bounds of the audit right contemplated by Congress in the 340B Statute.

104.    HRSA is obligated to follow the requirements of its own Manufacturer Audit Guidelines. HRSA's failure to adhere to its own Manufacturer Audit Guidelines denied UKHA notice of any perceived violations of the 340B Statute and denied UKHA the opportunity to work in good faith to resolve issues and avoid an unnecessary audit.

105.    HRSA's July 2, 2024 and November 12, 2024 letters demonstrate that its approval of J&J's audit is final. On multiple occasions, HRSA has clearly indicated that it has approved J&J's audit and that UKHA's failure to comply with J&J's audit constitutes grounds for

termination from the 340B Program. Thus, HRSA's decision is neither preliminary nor interlocutory in nature.

106.    HRSA's approval of J&J's audit request, in violation of the Manufacturer Audit Guidelines, is a final agency action subject to judicial review. HRSA's approval forces UKHA to undergo an overbroad and intrusive audit by a third-party pharmaceutical manufacturer, at great cost and without any recourse, or face termination from the 340B Program.

107.    And, while subsequent to a manufacturer audit, a *manufacturer* may file an ADR claim with HRSA over its audit findings, the *covered entity* has no power to file such a post-audit claim and has no ability to challenge the scope, breadth, or unlawfulness of the audit. 42 C.F.R. § 10.21. Nor would such a challenge provide any meaningful relief given that the audit will have already occurred.

108.    Notably, the panel that reviews such claims includes personnel from HRSA's Office of Pharmacy Affairs, the very same office that has already stated that the materials submitted by J&J in request of its audit, and reviewed by HRSA on an *ex parte* basis, were sufficient to establish reasonable cause that a 340B violation occurred. *See* Exhibits 7 & 8.

109.    HRSA's actions here have caused clear and fixed legal consequences that negatively impact UKHA and cannot be redressed through any other method than the instant lawsuit.

**UKHA Will Be Irreparably Harmed Without Court Intervention**

110.    HRSA's final decision to approve J&J's audit, outside its own Manufacturer Audit Guidelines, will cause UKHA immediate and irreparable harm.

111.    Unless the Court intervenes, UKHA will be forced to comply with J&J's audit demands and provide voluminous confidential information to a drug manufacturer, through its

auditor, that would not otherwise have a legal right to such information, or face termination from the 340B Program.

112.    Many of Deloitte's document requests exceed the scope of that which is permitted under the 340B Statute and the Manufacturer Audit Guidelines because they do not directly pertain to UKHA's compliance with the duplicate discount and diversion prohibitions. And, without a copy of the audit plan, UKHA has no way of knowing whether the requests are even relevant to whatever audit objectives J&J proposed to HRSA.

113.    Given the overly broad scope of the requests, UKHA will be forced to expend substantial resources in collecting the requested information, and may be forced to produce highly sensitive patient, employee, provider, vendor, and/or business information for nothing more than a fishing expedition by J&J. This audit will consume time and resources that would otherwise be dedicated to patient care—a critically negative impact given UKHA's position as a safety net provider.

114.    UKHA's public and professional reputation, in addition to its ability to challenge any of J&J's audit findings, will be irreparably harmed without this Court's intervention, as J&J has a history of publicly accusing covered entities of abusing the 340B program, such as their statements filed in the *Genesis* case referenced above.

115.    UKHA has reasonable concerns that J&J will disparage UKHA both publicly and professionally, as drug manufacturers are known to communicate with one another about covered entities' participation in the 340B Program.

116.    Also, given J&J's history of making public accusations of 340B Program abuse against covered entities, UKHA reasonably believes that J&J will misuse the audit process to irreparably injure UKHA's reputation.

117.    Worse yet, if UKHA does not agree to participate in J&J's unlawfully approved audit that exceeds the scope of the 340B Statute, HRSA will likely terminate UKHA from the 340B Program. Termination would result in devastating and irreversible damage to UKHA both financially and reputationally. UKHA relies on the savings it generates from the 340B Program to fund critical services and hospital operations, and without access to these savings, UKHA would be unable to provide anywhere near the amount of reduced cost or free services that its State and community relies on. Moreover, UKHA faces irreparable harm to its reputation if HRSA terminates UKHA from the 340B Program or even publicizes its intent to terminate UKHA from participation in the program.

118.    HRSA's unlawful approval of J&J's overbroad and inappropriate audit will cause real and serious harm that cannot be adequately compensated or otherwise remedied other than through the instant lawsuit.

## COUNT I
### (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

119.    UKHA repeats and realleges paragraphs 1 through 118 as if fully set forth herein.

120.    As set forth above, HRSA's decision to allow J&J to proceed with the manufacturer audit of UKHA without first going through the notice and good-faith engagement procedures set out in the Manufacturer Audit Guidelines was arbitrary, capricious, and contrary to law.

121.    In addition, HRSA's decision to allow J&J's audit, which goes outside the scope of manufacturer audits allowed under the 340B Statute and the Manufacturer Audit Guidelines was arbitrary, capricious, and contrary to law.

122.    Lastly, HRSA's decision that UKHA's failure to comply with J&J's unlawfully approved audit is grounds for termination from the 340B Program is arbitrary, capricious, and contrary to law.

123.    Collectively, HRSA's actions as described herein are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C)-(D).

124.    HRSA's decision represents a final agency action for which UKHA has no other remedy at law.

125.    UKHA would be immediately and irreparably harmed if HRSA's actions are allowed to stand.

126.    Both the public interest and the intent of Congress will be furthered by an order from this Court that vacates HRSA's decision to approve J&J's audit of UKHA, vacates HRSA's decision that UKHA's failure to comply with the J&J audit is grounds for termination from the 340B Program, and prohibits HRSA from approving any audit in the future without adhering to the written notice and good-faith resolution attempt procedures outlined in the Manufacturer Audit Guidelines.

## **PRAYER FOR RELIEF**

**WHEREFORE**, UKHA requests that this Court enter judgment in its favor and against HRSA as follows:

A.    Entry of judgment declaring that HRSA's decision to approve J&J's audit request with respect to UKHA was arbitrary, capricious, and contrary to law.

B.    Entry of judgment declaring that HRSA's decision that UKHA's failure to comply with the J&J audit is grounds for termination from the 340B Program was arbitrary, capricious, and contrary to law.

C.      Entry of an injunction barring HRSA, and any entities acting in concert with them, from initiating and/or pursuing any enforcement actions against UKHA in connection with J&J's proposed audits.

D.      An order awarding UKHA costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

E.      Any other and further relief that the Court deems just and proper.

Dated: February 24, 2025

Respectfully submitted,

POLSINELLI, PC

By: */s/ Chad Landmon*
　　CHAD LANDMON
　　(D.C. Bar No. 990347)
　　Suzanne Bassett
　　(D.C. Bar No. 888314688)
　　1401 Eye ("I") Street, N.W., Suite 800
　　Washington, DC 20005
　　Telephone: (202) 783-3300
　　Fax: (202) 783-3535
　　clandmon@polsinelli.com
　　sbassett@polsinelli.com

　　Kyle A. Vasquez (*pro hac* forthcoming)
　　150 N. Riverside Plaza, Suite 3000
　　Chicago, Illinois 60606
　　Telephone: (312) 463-6338
　　kvasquez@polsinelli.com

　　Sabrina Marquez (*pro hac* forthcoming)
　　1000 Second Avenue, Suite 3500
　　Seattle, Washington 98104
　　Telephone: (206) 393-5400
　　smarquez@polsinelli.com

　　*Attorneys for Plaintiff University of*
　　*Kansas Hospital Authority*

31